## Richmond.

BEVERAGE'S COMMITTEE V. RALSTON.

NOVEMBER 22, 1900.

Absent, Phlegar, J.*

1. FRAUD—*Inadequate Consideration—Incompetency—Insanity.*—Upon the evidence in this case, it does not appear that the deeds assailed were obtained by fraud, nor for an inadequate consideration. The grantor had been adjudged insane in 1892, but had been discharged from the hospital in December of that year. He was recommitted to the hospital in 1896. The deeds assailed were made in·March, 1895. Upon the evidence as to insanity, it not only does not appear that the grantor was mentally incompetent at the time the deeds assailed were made, but a preponderance of evidence shows the contrary.

Appeal from a decree of the Circuit Court of Highland county, pronounced October 4, 1899, in a suit in chancery, wherein the appellant was the complainant, and the appellees were the defendants.

*Affirmed.*

The opinion states the case.

*S. B. Seig,* and *Patrick & Gordon,* for the appellant.

*Charles P. Jones,* for the appellees.

BUCHANAN, J., delivered the opinion of the court.

This suit was brought by the Committee of S. C. Beverage

*This case was argued and submitted before Judge Phlegar qualified.

to set aside an agreement and two deeds executed by the said Beverage, by which he sold and conveyed certain real and personal estate, upon the grounds that the agreement and deeds were made when Beverage was insane, and their execution procured by fraud and for an inadequate consideration by the grantees in the deeds.

The record shows that Beverage was adjudged a lunatic in the year 1892, and confined in the Western State Hospital on the 30th day of August of that year; that on the 26th day of September he was furloughed and returned to his home in Highland county; that on the 27th of December of the same year he was discharged, as cured, upon the certificate of a physician of that county; and that upon the 26th day of April, 1896, he was sent back to, and is now an inmate of, the said hospital for the insane.

The agreement and conveyances sought to be set aside were made in March, 1895, a little over three years after he had been discharged from the hospital upon his first, and about thirteen months before his last, confinement therein.

The charge that the consideration agreed to be paid was grossly inadequate is not sustained by the proof. The land conveyed to Rexrode, one of the grantees, was worth little, if any more, according to the evidence, than he agreed to pay for it. The real property conveyed to Ralston, the other grantee, is variously estimated at from $800 to $1,500. It was shown to have been sold prior to that time for about $800. The average value placed upon it by the witnesses is less than $1,200. The personal property which Ralston received is estimated as worth from $100 to $140. For the property conveyed to him, he agreed to pay the vendor's debts, amounting to about $3,500; to pay each of his five infant children $98.60, without interest, when they respectively became of age, and "to furnish the grantor during the term of his natural life sufficient meat, drink, apparel, washing, lodging, and all other things necessary

for his proper support and maintenance in sickness and in health, but this maintenance is to be furnished only at the residence of said Ralston, and so long as said Beverage resides with him." At that time the grantor was about fifty-five years of age. The payment of more than $800 in money on the debts and to the children of the grantor, and his own maintenance and support. as provided for can hardly be said to be an inadequate consideration for the property conveyed to Ralston.

There is nothing in the evidence to show that the agreement with, or conveyance to, Ralston was fraudulently procured by him.

Rexrode's conduct in the transaction is somewhat suspicious, but the evidence does not clearly show that he was guilty of fraud.

The remaining question for consideration is the vendor's mental condition when the agreement and deeds were made.

It clearly appears that Beverage was insane when sent to the Western State Hospital in the year 1892, and when he was returned there in the year 1896. The evidence as to his mental condition from the time he was discharged from the hospital in December, 1892, until the execution of the agreement and deeds sought to be set aside, is conflicting.

The superintendent of the hospital and his assistant testified that, from the character and history of his mental trouble, they did not think he was competent to transact business after his first admission to the hospital in 1892. They had not, however, seen him from the time he was permitted to leave the hospital on furlough, in September, 1892, until he was returned there in 1896. Dr. Trimble, one of the commission which adjudged him to be insane in 1892, and upon whose certificate he was discharged from the hospital as cured in December, 1892, testified that he did not consider him an entirely sane man when he gave that certificate, but gave it at the solicitation of Mr. Beverage's friends, especially of a brother, and because the fact that

he was an inmate of the hospital was preying upon his (Beverage's) mind, and he thought a discharge therefrom would probably be helpful to him. He further testified that he met Beverage after his discharge, when he thought his mind was in its normal condition; that he had lucid intervals, but he did not know their duration.

It appears that, from the time of his discharge from the hospital in 1892 until after the transactions sought to be set aside, Beverage attended to his own business, and whilst a number of witnesses testify that he was incompetent to make contracts, some of them did make contracts with him during that period, and few of them gave any facts upon which their opinion as to his incapacity was based.

Mr. Campbell, one of the attesting witnesses to the agreement, and who had been Commissioner of the Revenue for his county since 1879, testified that he had known Mr. Beverage for more than twenty years; that a few days before the agreement of March 11, 1895, was written, Mr. Beverage came to his office and requested him to write an agreement for him, if he made a certain sale; that afterwards, on the day the agreement was written, he returned, and witness, with the assistance of Mr. Colaw, an attorney at law, wrote the agreement in controversy, Mr. Beverage stating its terms minutely and explicitly; that upon neither of these occasions did he show any symptoms of mental disturbance, and was, in the opinion of the witness, competent to contract.

Mr. Colaw, the other subscribing witness and the attorney who aided in preparing the agreement, was unable to speak as to Mr. Beverage's mental condition on that day, further than that he saw nothing wrong in his words or actions on that occasion.

Mr. Stephenson, the attorney who afterwards prepared the deeds complained of, testified that Mr. Beverage, whom he had known for many years, came to him to draw them, stating with

clearness and particularity the terms of the agreement, and how he wished the deeds written; that they were so drawn, and that Mr. Beverage was perfectly sane, and entirely competent to make any kind of a contract on that day.

It further appears that Mr. Beverage kept a toll-gate upon the S. and P. turnpike during the winter of 1894 and 1895, and the preponderance of evidence is that he properly performed his duties. A number of witnesses testified that they met him frequently during that winter, and that they saw nothing wrong with his mind. Among these witnesses were persons with whom he had dealings, who had worked for him, or with whom he had boarded.

Without further discussing the evidence, it is sufficient to say that upon the whole case we are of the opinion that it not only does not appear that Mr. Beverage was mentally incompetent to make the agreement and conveyances in question, at the times they were made, but, on the contrary, it is shown by a preponderance of evidence, we think, that he was competent at those times to contract.

The decree appealed from dismissing the appellant's bill must therefore be affirmed.

*Affirmed.*